# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

THE ESTATE OF WILLIAM C. BARNETT, by and through his Administrator, ADRIAN BARNETT, WILLIAM CHRISTOPHER BARNETT, KAMYLLE MARIE BARNETT, ADRIAN BARNETT, Mother and Legal Guardian of W.C.B., a minor, and W.C.B., a minor,[1]

    Plaintiffs,

v.

ABNAH FORBES, P.A., JULIA WILSON, M.D. and NAPHCARE, INC,

    Defendants.

Consolidated Civil Action Nos.
1:21-cv-00713-VMC
1:21-cv-02890-VMC

**ORDER**

Before the Court is the Motion of Abnnah Forbes, PA and Julia Wilson, MD (collectively, "Individual Defendants") and NaphCare, Inc. ("NaphCare," and with the Individual Defendants, "Defendants") for Summary Judgment. ("Motion," Doc. 47). Also before the Court is the Defendants' Motion for Leave to

---

[1] The Parties appear to use the full name of minors in the caption in violation of Rule 5.2(a)(3). It is unclear to the Court whether these Plaintiffs have reached the age of maturity since the filing of this case. The Parties should address this issue in a future filing.

File Supplemental Authority (Doc. 54), which the Court will grant. For the reasons that follow, the Court will grant the Motion in part and deny the Motion in part.

**Background**

City of Atlanta police officers arrested William C. Barnett on July 15, 2019, charged him with misdemeanor theft, and transported him to the Fulton County Jail (the "Jail"). (Doc. 50-2 ¶ 1). Fulton County, Georgia, contracts with NaphCare to provide medical services to the inmates at the Jail. (*Id.* ¶ 2).

Upon his arrival and booking at the Jail, Mr. Barnett underwent a receiving screening by a licensed practical nurse (LPN). (*Id.* ¶ 3). The screening included questions answered by Mr. Barnett and questions answered by the arresting officer. (Doc. 50-3 at Ex. 3, at 0084-0088). For the questions answered by Mr. Barnett, the LPN did not check the box for "Abused alcohol or sedatives?" or for "Experienced significant alcohol or drug withdrawal?" (*Id.* at 0081). The LPN did not check the box indicating Mr. Barnett reported currently feeling depressed or having thoughts of self-harm or suicide. (*Id.* at 0079). However, Mr. Barnett did report feeling "messed up" about the current situation. (*Id.* at 0080).

For the questions to be completed by the arresting officer, the field entitled "Is the arresting officer aware of any of the following?," the LPN checked "NA" for "Under Influence of Drugs or Alcohol." (*Id.* at 0084). The box entitled "History or risk of alcohol or drug withdrawal" was not checked. (*Id.* at 0087). Under the

field entitled "Most recent alcohol, sedative, or opiate use:", neither of the two options "5 days or less" or "6 days or greater" were selected. (*Id.* at 0087).

Four days later, on July 20, 2019, Mr. Barnett's behavior became erratic, and he was transferred to a suicide watch cell within the Jail's infirmary. (Doc. 50-2 ¶ 5). Due to his erratic behavior, NaphCare professionals performed a mental health screening on Mr. Barnett. (Doc. 52 ¶ 3). During that mental health screening, Mr. Barnett told the NaphCare employee that he began drinking alcohol at the age of 13, that he drank beer on a daily basis but was unsure of the amount of beer he drank daily, and that he never received any formal treatment for drinking alcohol. (*Id.* ¶ 4).

On July 20, 2019 and July 21, 2019 while in suicide watch, Mr. Barnett became combative. (*Id.* ¶ 6). In the early morning hours of July 21, 2019, he was observed with "a raised area bleeding on his forehead" and was reported to have been banging his head on the wall. (Doc. 50-2 ¶ 6). He was transferred to the Jail urgent care clinic for evaluation and was noted to be kicking and swinging when transferred onto a stretcher for transport to the Jail's urgent care clinic. (*Id.*).

At the Jail's urgent care clinic, a Nurse Practitioner noted that Mr. Barnett appeared disoriented, had a contusion to his forehead, and a hematoma to his right parietal region. (*Id.* ¶ 7). He received two milligrams of Ativan and was

transported by Emergency Medical Services ("EMS") to Grady Memorial Hospital ("Grady") for evaluation and treatment. (*Id.*).

Mr. Barnett arrived at Grady at 6:00 a.m. on July 21, 2019. Abigail Hankin-Wei, M.D. was Barnett's attending physician in the Emergency Department. (*Id.* ¶ 8). The medical providers at Grady took a history and performed a physical examination of Mr. Barnett. (*Id.* ¶ 9). No history of alcohol abuse was given, suspected, or noted, and Mr. Barnett's Grady records reflect that the results of the physical examination performed on July 21, 2019, revealed a normal heart rate and rhythm, "normal heart sounds[,] and intact distal pulses." (*Id.*). Mr. Barnett did not report or provide information to Grady's medical providers of previous treatment at Grady for alcohol abuse. (*Id.* ¶ 10).

Mr. Barnett underwent imaging studies for his hand, wrist, chest, pelvis, head, and spine at Grady on July 21, 2019. (*Id.* ¶ 11). The imaging studies were read by a radiologist and reported back as negative. (*Id.*). At about 7:16 a.m., providers at Grady also drew blood for an initial comprehensive metabolic panel. (*Id.* ¶ 12). Mr. Barnett's initial serum potassium level was reported by the Grady Laboratory ("Lab") as low at 2.7 mEq/L (reference range 3.4-5.1 mEq/L). (*Id.* ¶ 13).

At 9:57 a.m., Grady providers ordered, and Mr. Barnett received, 10 mEq/L of potassium chloride intravenously to raise his serum potassium level. (*Id.* ¶ 14).

At 1:06 p.m., Mr. Barnett's serum potassium level was re-checked. (*Id.* ¶ 15). His serum potassium level in the second comprehensive metabolic panel was reported as having increased to 3.1 mEq/L. (*Id.* ¶ 16). He received an additional 40 mEq of potassium bicarb-citric acid orally at about 1:48 p.m., after his serum potassium level was reported by the Lab as 3.1 mEq/L. (*Id.* ¶ 17). Dr. Hankin-Wei testified that the oral potassium would raise Mr. Barnett's serum potassium by 0.1 for every ten milliequivalents, and it would continue to increase if he ate without vomiting. (*Id.* ¶ 18). Dr. Hankin-Wei determined that Mr. Barnett tolerated the oral potassium and was appropriate for discharge to the Jail. (*Id.* ¶ 19). Providers from Grady discharged Mr. Barnett at approximately 3:48 p.m. on July 21, 2019, with written discharge instructions ("Grady Discharge Instructions") to NaphCare. (*Id.* ¶ 20).

The first page of the Grady Discharge Instructions states: "Go to [t]he physician at your jail in 3 days (around 7/24/2019). Why: To advise on your progress, and assess need for further management." (*Id.* ¶ 21). The Grady Discharge Instructions also stated for Mr. Barnett to return to the ER if "you develop new or worsening symptoms." (*Id.*). A provider from Grady also provided the Jail with handwritten instructions on the Grady Discharge Instructions that states: "Follow up w/ primary care to recheck chemistry labs (mainly) potassium levels + head injury as well as follow up w/ psychiatry for

evaluation." (*Id.* ¶ 22). Mr. Barnett arrived back at the Jail at about approximately 4:00 p.m. on July 21, 2019. (*Id.* ¶ 23). Defendant Forbes, a Physician's Assistant and NaphCare employee, received Mr. Barnett and evaluated him; this was PA Forbes's sole encounter with Mr. Barnett. (*Id.* ¶ 24). PA Forbes noted that Mr. Barnett had an abrasion on his forehead but that he was not in any acute distress. (*Id.*). PA Forbes reviewed the Grady Discharge Instructions which stated that Mr. Barnett needed to be re-evaluated in three days and also stated for Mr. Barnett to return to the ER if "[he] develop[s] new or worsening symptoms." (*Id.* ¶ 25). After PA Forbes evaluated Mr. Barnett and reviewed the Grady Discharge Instructions, Mr. Barnett returned to his cell within the infirmary at the Jail. (*Id.* ¶ 26). Dr. Wilson was the medical director at the Jail in July 2019. (*Id.* ¶ 52). Dr. Wilson was not present at the Jail when Mr. Barnett returned on July 21, 2019. (*Id.* ¶ 53). Dr. Wilson testified that it was her "usual practice" to look at Grady return paperwork. (Deposition of Julia Wilson, MD dated Feb. 10, 2022 at 70:8–10, "Wilson Dep.," Doc. 46-1).

The infirmary at the Jail has a registered nurse on call twenty-four hours per day. (*Id.* ¶ 27). Progress notes kept by LPN Helaine Jones indicate that at "7:16:08 PM CDT," Mr. Barnett was "awake sitting on floor in cell eating a sandwich." (Doc. 50-3 at 0052). Nurse Jones indicated that on "7/22/2019 3:08:32 AM CDT," Mr. Barnett was "sitting on floor of cell eating breakfast sandwhich [sic]." (*Id.*). During

6

a July 22, 2022 "Suicide Intake Risk Assessment, Mr. Barnett did not self-report "eating difficulties." (*Id.* at 0112–0114). However, Plaintiffs contend that Postmortem photographs taken by the Fulton County Medical Examiner's office show that Mr. Barnett was not eating his food, as evidenced by the multiple uneaten meals on the floor of his Jail cell. (Doc. 52 ¶ 32; Doc. 50-6).

Mr. Barnett was found nonresponsive at approximately 4:20 p.m. on July 22, 2019. (Doc. 50-2 ¶ 29). CPR was performed at the Jail until EMS took over resuscitative efforts. Barnett was transported to Grady. (*Id.*). Dr. Jordi Fonts pronounced Barnett's death at Grady at 5:32 p.m. on July 22, 2019. (*Id.* ¶ 30).

The Fulton County Medical Examiner's Office conducted an autopsy and issued an Autopsy Report on July 24, 2019. (*Id.* ¶ 31). It lists the cause of death as probable cardiac arrhythmia due to dilated cardiomyopathy due to chronic alcohol use. The Autopsy Report lists "other conditions" as "hypokalemia, hepatic steatosis, hypertrophic cardiomyopathy, probably hypertensive." (*Id.* ¶ 32). The Medical Examiner's Office also conducted a postmortem Toxicology Report. (Doc. 47-12). The Toxicology Report indicated a potassium level of ">10.0 meq/L," but did not indicate a reference range for that value. (*Id.* at 4). Dr. Rachel Geller, who performed the autopsy on Mr. Barnett at the Fulton County Medical Examiner's office, stated that the postmortem toxicology level had no bearing on Mr. Barnett's potassium level at the time of death, testifying that "[a]fter death, potassium rises

in most cases." (Deposition of Rachel Geller, M.D. dated August 31, 2022 at 30:22–25, "Geller Dep.," Doc. 46-3).

Dr. Jan Gorniak, the Fulton County Medical Examiner at the time of the Autopsy, testified that Mr. Barnett's death was caused by a probable cardiac arrythmia due to dilated cardiomyopathy due to chronic alcohol use. (Deposition of Jan Gorniak, D.O. dated May 19, 2022 at 16:9-13, "Gorniak Dep.," Doc. 41-5). She concluded that chronic alcoholism was the cause of the dilated cardiomyopathy based on pre-incarceration clinical history contained within medical records she received from Grady. (*Id.* at 18:4-22). She also stated that hypokalemia (low potassium) also could have contributed to Mr. Barnett's cardiac arrhythmia. (*Id.* at 65:8-22).

## Legal Standard

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

## Discussion

Plaintiffs are the survivors and personal representative of Mr. Barnett. In these two consolidated actions, Plaintiffs bring five claims. First, in No. 1:21-cv-00713-VMC, Plaintiffs' Complaint raises three counts: Count I for deliberate indifference under 42 U.S.C. § 1983 against PA Forbes, Count II for deliberate indifference under 42 U.S.C. § 1983 against Dr. Wilson, and Count III for attorney's fees. Next, in No. 1:21-cv-02890-VMC, Plaintiffs' Complaint raises an additional two counts: Count I for medical negligence, also called malpractice, against Defendant NaphCare and Count II for attorney's fees. Defendants seek summary judgment on all claims.

### I. Deliberate Indifference

Counts I and II against the respective Individual Defendants are claims under 42 U.S.C. § 1983 for violation of Mr. Barnett's constitutional rights. Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "In order to prevail in a civil rights action under section 1983, 'a plaintiff must make a prima facie showing of two elements: (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law.'" *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (quoting *Bannum, Inc. v. City of Ft. Lauderdale*, 901 F.2d 989, 996-97 (11th Cir. 1990)).

The Fourteenth Amendment prohibits cruel and unusual punishment to pretrial detainees under the same standards as the Eighth Amendment. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). "Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020). To state a claim for deliberate indifference, a plaintiff must allege (1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury. *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016), *overruled in part on other grounds by Wade v. McDade*, 67 F.4th 1363, 1374 (11th Cir. 2023)[2].

---

[2] In *Wade*, a panel of the Eleventh Circuit purported to resolve a split between competing Eleventh Circuit opinions on whether the mens rea standard for deliberate indifference was "more than mere negeligence" or "more than gross

11

As to the second element, to establish deliberate indifference, "a plaintiff must establish that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than gross negligence." *Wade*, 67 F.4th at 1374. "Each individual Defendant must be judged separately and on the basis of what that person knows." *Melton*, 841 F.3d at 1224 (alterations omitted).

Plaintiffs allege that Dr. Wilson was deliberately indifferent to Mr. Barnett's medical needs on a supervisory liability theory. Where the allegations of a constitutional violation are against a supervisor (as here), that supervisor cannot be held personally liable under Section 1983 on a theory of respondeat superior. *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995) (citing *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 691 (1978)). Rather, in addition to showing an underlying violation by a subordinate, a claim against an individual supervisor must arise from the supervisor's personal participation in the alleged constitutional violation or from a causal connection between the actions of the supervising official and the alleged

---

negligence," citing the prior panel precedent rule. *Wade*, 67 F.4th at 1373. A petition for rehearing and rehearing en banc was filed on June 12, 2023 and is currently still pending. No. 21-14275 (11th Cir. Jun. 12, 2023). The Eleventh Circuit withheld the mandate, meaning that if the panel does not grant rehearing, a poll on rehearing en banc will be taken. 11th Cir. I.O.P. 35.3. Nonetheless, the Court considers itself bound by the *Wade* court's determination of the prior panel precedent rule, and will apply the *Wade* formulation of "more than gross negligence" until such time as that order is vacated or rehearing is denied.

constitutional deprivation. *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir.2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010)). Plaintiffs appear to argue that Dr. Wilson is liable on a personal participation theory based on her testimony that it was her habit to review discharge instructions from Grady.

Plaintiffs' theory of serious medical need is Mr. Barnett's allegedly low potassium level which they contend necessitated prompt and repeated re-checking upon return to the jail. Defendants dispute that Mr. Barnett's potassium level was low, pointing to his potassium levels in his postmortem toxicology reports, but as Dr. Geller testified, this is of little evidentiary value because potassium levels increase postmortem. (Geller Dep at 30:22–25). Defendants also argue that Plaintiffs fail to point to any evidence that Mr. Barnett's potassium levels were critically low upon his return to the Jail and leading up to his death, but the Court finds that the fact that his Grady Medical Records showed a low potassium level at his initial visit, combined with the testimony of Dr. Hankin-Wei that Mr. Barnett's potassium levels would continue to increase if he ate without vomiting, (Doc. 50-2 ¶ 18) and the factual dispute about whether Mr. Barnett was able to continue eating upon returning to his cell based on the photographs of the Jail cell, together create at the very least a reasonable inference that Mr. Barnett's

potassium levels were low leading up to the time of his death. Thus, there is a factual dispute on this issue which cannot be resolved on summary judgment.

Defendants also contend that even if Mr. Barnett's potassium level was low, it did not cause his death, but raise the issue in connection with Plaintiffs' medical negligence claim. The Court will likewise defer discussion of causation to the following section. All that remains then is the question of deliberate indifference to the low potassium levels, which again requires showing subjective knowledge of a risk of serious harm, disregarded of that risk, and more than gross negligence. *Wade*, 67 F.4th at 1374.

Plaintiffs contend that the Individual Defendants had subjective knowledge of the risk arising from Mr. Barnett's low potassium levels because they reviewed the Grady discharge papers. However, the Court finds the evidence insufficient to create a fact dispute on this issue. While the handwritten instructions on the Grady Discharge Instructions instructed the Jail to "[f]ollow up w/ primary care to recheck chemistry labs (mainly) potassium levels + head injury as well as follow up w/ psychiatry for evaluation," it must be read in context with the first page of the Grady Discharge Instructions which read "[g]o to [t]he physician at your jail in 3 days (around 7/24/2019)." (Doc. 50-2 ¶¶ 21–22). The Court is not suggesting that the only permissible construction of these two instructions is that a recheck should take place in three days, but that Defendants' proffered interpretation is

reasonable enough that, absent other direct or circumstantial evidence of their knowledge, Plaintiffs have failed to raise a reasonable inference that the Individual Defendants were aware of a risk of death or serious injury due to low potassium levels necessitating immediate and continuous rechecking of Mr. Barnett's levels such that a failure to do so was deliberate indifference. Similarly, while Plaintiffs point to the discharge instructions that require readmission for new or worsening symptoms, they point to absolutely no evidence that either of the Individual Defendants had subjective awareness of worsening symptoms. Accordingly, the Court finds summary judgment on these counts appropriate.[3] Summary judgment on the attorney's fees claims against the Individual Defendants is thus also appropriate.

## II. Malpractice

Plaintiffs also bring claims against NaphCare for medical malpractice. "In Georgia, '[a] person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had.'" *Myrick v. Fulton Cnty.*,

---

[3] The Court thus need not reach the question of whether the Individual Defendants were more than "grossly" negligent. *But see Clark v. Sheffield*, 807 F. App'x 910, 916–17 (11th Cir. 2020) (rejecting such an argument where defendants took a "course of action [that was] consistent with . . . discharge instructions from the hospital.").

69 F.4th 1277, 1305 (11th Cir. 2023) (quoting O.C.G.A. § 51-1-27). "A claim under this medical malpractice statute essentially has three elements." *Id.* at 1305–06. "A plaintiff must show (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure was the proximate cause of the injury sustained." *Id.* at 1306 (citing *Med. Ctr. of Cent. Ga. v. Landers*, 616 S.E.2d 808, 813 (Ga. Ct. App. 2005)).

The parties agree that Mr. Barnett and NaphCare had a doctor-patient relationship. Plaintiffs rely on the expert testimony of Timothy Hughes, M.D. to establish a breach of the standard of care, arguing among other things that the following constituted breaches:

> 1) The failure to identify and document Mr. Barnett as having a substance abuse disorder (longstanding dally alcohol use) at the time of intake, and to place Mr. Barnett in an area with appropriately trained medical observers, using well established substance abuse monitoring tools . . . .
>
> 2) . . . [D]espite his behaviors documented, . . . [the failure to provide] a psychiatrist or other physician to fully evaluate his condition . . . .
>
> 3) . . . [The failure to investigate t]he root cause of his hypokalemia . . .
>
> 4) The failure to communicate and schedule the need for a reassessment of Mr. Barnett's potassium levels upon return to the jail.

(Doc. 50 at 11–13). As Plaintiffs argue, "[i]n sum, [a]ccording to Dr. Hughes, NaphCare, Inc. clearly breached the standard of care by not identifying and

16

treating Barnett's classic signs of alcohol withdrawal, and by not monitoring Barnett's potassium level when he returned to the Jail from Grady hospital." (*Id.* at 13).

In its opening brief, NaphCare writes in a footnote that "[a]s articulated in Section IV.B(1) and (2) above, and incorporated by reference, there is no evidence that either Dr. Wilson or Forbes breached the standard of care." (Doc. 47-1 at 17 n.4). However, this argument is insufficient because (1) that section of the brief refers to the deliberate indifference claim, which as the Court noted above, requires a showing of "more than gross negligence," i.e., there exist acts which breach the standard of care but do not rise to the level of deliberate indifference; and (2) it only refers to the actions of Dr. Wilson and PA Forbes, but NaphCare acted through other agents with respect to Mr. Barnett. For the first time in its reply, NaphCare attempts to elaborate on its argument that Dr. Hughes's opinion does not establish a breach, but the Court generally will not consider arguments made for the first time in reply. However even if considered, NaphCare's arguments amount to echoing those the Individual Defendants made regarding the Grady Discharge Instructions. While such arguments may insulate the Individual Defendants from liability under a deliberate indifference standard, it does not relieve NaphCare and its professional employees from their own responsibility to use their own medical judgment. Moreover, Dr. Hughes's

disagreements with Dr. Hankin-Wei's interpretation of her instructions and the Fulton County Medical Examiner's conclusions merely create a fact dispute as to breach.

Lastly, the Court finds there is a factual dispute as to causation. "Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." *Myrick*, 69 F.4th at 1307 (quoting *Zwiren v. Thompson*, 578 S.E.2d 862, 867 (Ga. 2003)). "What amounts to proximate cause is undeniably a jury question." *Id.* (quoting *Zwiren*, 578 S.E.2d at 865; *Dowdell v. Wilhelm*, 699 S.E.2d 30, 32 (Ga. Ct. App. 2010) ("Normally, questions of proximate cause are for the jury, but plain and indisputable cases … may be decided by the court as a matter of law.")).

Plaintiffs' expert, Dr. William Anderson testified that to a reasonable degree of medical certainty, Mr. Barnett's fatal cardiac arrhythmia resulted from untreated alcohol withdrawal resulting in hypokalemia. (Deposition of William Anderson, MD dated Aug. 24, 2022 at 93:22–94:7, "Anderson Dep.," Doc. 41-7). The fact that Dr. Anderson could not testify to Mr. Barnett's potassium level at death with a reasonable degree of medical certainty does not render his opinion insufficient to establish causation because, as the Court held above, the facts (including Plaintiffs' arguments about uneaten food in the Jail cell) create a

reasonable inference that Mr. Barnett's levels remained low through the time of his death. Accordingly, the Court will deny summary judgment on this ground.

## Conclusion

For the above reasons, it is

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. 47) is **GRANTED IN PART** and **DENIED IN PART**. It is

**FURTHER ORDERED** that Defendants' Motion for Leave to File Supplemental Authority (Doc. 54) is **GRANTED**. It is

**FURTHER ORDERED** that the parties are **DIRECTED** to file redacted versions of their sealed summary judgment briefing no later than 60 days after the date of entry of this Order in accordance with the Court's Standing Order. It is

**FURTHER ORDERED** that the Clerk is **DIRECTED** to enter final judgment in favor of Defendants Abnah Forbes, PA and Julia Wilson, MD and against Plaintiffs in Case No. 1:21-cv-00713-VMC and to close that case.[4] It is

**FURTHER ORDERED** that the Clerk is **DIRECTED** to reopen Case No. 1:21-cv-02890-VMC. All further proceedings shall take place in that case. It is

---

[4] *Hall v. Hall*, 138 S. Ct. 1118, 1131 (2018) ("Rule 42(a) did not purport to alter the settled understanding of the consequences of consolidation. That understanding makes clear that when one of several consolidated cases is finally decided, a disappointed litigant is free to seek review of that decision in the court of appeals.").

**FURTHER ORDERED** that Plaintiffs and NaphCare are **DIRECTED** to submit a consolidated pretrial order no later than 21 days after the date of entry of this Order. In the event the parties intend to mediate the case, the Parties may contact chambers by phone (404-215-1390) to obtain an extension of this deadline.

**SO ORDERED** this 15th day of September, 2023.

_____
Victoria Marie Calvert
United States District Judge